IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORI ANN MRUK,                    :
                                  :
        Plaintiff,                :
                                  :
    v.                            :    3:13-cv-00321
                                  :
CAROLYN W. COLVIN, ACTING  :    Hon. John E. Jones III
COMMISSIONER OF SOCIAL     :
SECURITY,                         :
                                  :
        Defendant.                :

## **<u>MEMORANDUM</u>**

## **August 7, 2014**

### <u>Introduction</u>

Plaintiff Lori Ann Mruk has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Mruk's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  Mruk met the insured status requirements of the Social Security Act through December 31, 2013.  Tr. 21.[1]

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

Mruk protectively filed her application for disability insurance benefits on August 24, 2009, claiming that she became disabled on August 31, 2008. Tr. 19, 120, 122. Mruk has been diagnosed with multiple sclerosis ("MS"), migraine headaches, and anxiety. Tr. 21. On March 24, 2010, Mruk's application was initially denied by the Bureau of Disability Determination. Tr. 73.

On April 26, 2010, Mruk requested a hearing before an administrative law judge ("ALJ"). Tr. 80. The ALJ conducted a hearing on March 24, 2011, where Mruk was represented by counsel. Tr. 35-70. On June 20, 2011, the ALJ issued a decision denying Mruk's application. Tr. 19-28. On December 13, 2012, the Appeals Council declined to grant review. Tr. 1. Mruk filed a complaint before this Court on February 8, 2013. Supporting and opposing briefs were submitted and this case became ripe for disposition on August 20, 2013, when Mruk declined to file a reply brief.

Mruk appeals the ALJ's determination on three grounds: (1) the ALJ failed to fully develop the record, (2) the ALJ erred in her credibility assessment of Mruk, and (3) the ALJ's residual functional capacity determination was flawed. For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Mruk is 44 years of age, is a high school graduate, has a teacher's certificate in cosmetology, and is able to read, write, speak and understand the English

language.  Tr.  44, 155.  Mruk's past relevant work included work as a receptionist, which is classified as sedentary, semiskilled work; a cosmetologist, which is light, skilled work; and as a cosmetology teacher, which is light, skilled work.  Tr. 62-65.

### A.    Mruk's Physical and Mental Impairments

On November 20, 2007, Mruk presented to her primary care provider, Andrea Wessel, M.D.  Tr. 277.  At that visit, Mruk reported that she had stopped taking Effexor, prescribed for her anxiety issues, because she was not tolerating the medication well.  Id.  Mruk felt that "she [did] not have panic attack [issues] or anxiety issues."  Id.

Mruk returned to Dr. Wessel on September 4, 2008, complaining of numbness in her tongue, throat, and the roof of her mouth, as well as an inability to focus her eyes.  Tr. 268.  Mruk complained of pins and needles in the right fingertips and left toes, as well as numbness in her fingertips and occasional headaches.  Id.  Mruk reported tripping, but no recent falls, and denied muscle weakness or musculoskeletal or neurological problems, and had no motor deficits. Tr. 268-69.  Due to the possibility of neurological causes for these symptoms, an MRI was performed that day.  Tr. 247-48.  This MRI revealed multiple areas of white matter flair, nonenhancing lesions, and T2 hyperintensities suggestive of demyelinating disease such as MS.  Id.

3

On September 22, 2008, Mruk returned to Dr. Wessel for a follow-up appointment.  Tr. 262.  Mruk complained of continuing oral and left foot numbness, although the tingling sensation in her thigh had improved.  Tr. 623.  Mruk denied visual changes, and reported no new symptoms.  Id.  On October 22, 2008, James Hora, M.D., a neurological specialist, reviewed Mruk's medical records and opined that all available information was consistent with MS.  Tr. 350.  Dr. Hora noted that Mruk's numbness appeared to be exacerbated by her anxiety, but stated that Tranxene previously helped with the anxiety.  Id.

On December 5, 2008, Mruk reported that she had no recent sensory disturbances of her extremities and no motor weakness.  Tr. 258.  Mruk denied headaches, blurry vision, numbness or tingling, or musculoskeletal or neurological issues.  Id.  Dr. Wessel noted that there were no MS "symptoms at [the] present time," and Mruk denied any depression or anxiety symptoms.  Id.

On February 19, 2009, Mruk presented to Dr. Wessel complaining of a burning sensation and "needle pricks" in her left lateral arm, as well as lightheadedness from extreme cold and occasional headaches.  Tr. 252.  Mruk denied facial numbness, falls, tripping, or double vision; she had no motor deficits and had symmetric reflexes.  Tr. 252-53.  She also denied blurry vision, musculoskeletal or neurological issues, numbness, or tingling.  Id.  Dr. Wessel

believed that Mruk's MS was stable, and Mruk reported that her anxiety was controlled with Tranxene.  Id.

On May 5, 2009, Mruk presented to Mitchell Gross, M.D. for a neurological examination.  Tr. 334.  Mruk reported a history of headaches, visual dysfunction, right leg weakness, mouth and tongue numbness, burning and tingling in the arms and shoulders, fatigue, and heat sensitivity.  Id.  Dr. Gross diagnosed Mruk with MS and headaches.  Id.  A physical examination revealed that Mruk had normal strength throughout with no localized weakness.  Tr. 336.  She had a normal gait, a negative Rhomberg test, and normal sensation throughout except for mild sensory distortion in the right dorsal foot.  Id.  Mruk did not have a history of falls within the previous month, and did not have a physical or mental impairment that placed her at an increased risk of falling.  Tr. 337.  An MRI of Mruk's brain, conducted on May 11, 2009, showed no significant changes when compared with the September 2008 MRI.  Tr. 247.

On June 11, 2009, Mruk returned to Dr. Wessel for a follow-up appointment.  Tr. 246.  Mruk complained of occasional numbness in her cheeks and right toes; she also complained of frequent tripping, but denied any falls.  Id.  Mruk denied any weakness or increased sensory symptoms, and denied headaches, blurry vision, dizziness, lightheadedness, musculoskeletal, or neurological issues.  Tr. 246-47.  Mruk had begun taking Celexa for her anxiety issues and denied

depression or panic attacks.  Tr. 246.  Dr. Wessel noted that Treximet was helpful in alleviating Mruk's migraines.  Id.  On June 25, 2009, Dr. Wessel noted that Mruk's "MS symptoms [were] [s]table at [the] present time."  Tr. 240.

On August 10, 2009, Mruk returned to Dr. Gross, complaining of "on and off" facial tingling, some thigh paresthesias, and hip numbness when lying on her side.  Tr. 328.  Mruk reported some balance issues, as well as fatigue "due to her 9 [year old] waking her at night."  Id.  Mruk had no history of falls within the previous month, and did not have a physical or mental impairment that placed her at an increased risk of falling.  Tr. 330.

On October 1, 2009, Mruk informed Dr. Wessel that she was "still easily tripping," could not "see objects well up close," had a sore hip, and experienced weakness in her lower legs.  Tr. 452.  Mruk had no headaches, and denied numbness, tingling, lightheadedness, or dizziness.  Id.  Mruk's anxiety disorder was stable; she denied feeling depressed or having panic attacks.  Id.  A neurological exam was grossly normal and metabolic panel, liver function, and thyroid function tests were all normal.  Tr. 453, 462.

On November 16, 2009, Dr. Gross noted that Mruk had been taking Copaxone for her MS since August "and feels it is helpful."  Tr. 323.  Mruk reported working four hours a day, and complained of "brain fatigue" and concentration issues.  Id.  She had a negative Rhomberg test and a stable gait.  Id.

Mruk had no history of falls within the past month, and was not at an increased risk of falling due to her impairments.  Tr. 324.  Mruk complained that her vision was slightly worse than it had been before, especially in the right eye.  Tr. 323.  On December 4, 2009, Suzanne Proleika, O.D., opined that Mruk had no ocular problems and her acuity and visual fields were within normal limits.  Tr. 315, 317.  Mruk's vision with correction was 20/20 in both eyes.  Tr. 313.

On June 18, 2010, Mruk informed Dr. Wessel that, although she had been doing well on Copaxone, she had stopped taking the MS medication due to insurance issues.  Tr. 476.  Mruk denied having any recent falls or loss of balance, but stated that she did occasionally trip; she had no muscle weakness, no tingling, and no numbness.  Id.  Mruk also denied headaches, blurry vision, lightheadedness, dizziness, musculoskeletal, or neurological issues.  Id.

On October 22, 2010, Mruk returned to Dr. Gross.  Tr. 403.  Mruk reported that, since discontinuing use of Copaxone, she had a few "minor flares" that resulted in a burning sensation in her thigh and hip area.  Tr. 404.  She reported occasional and short-lasting weakness, but had not fallen, and reported transient episodes of double vision in her right eye.  Id.  Upon examination, Mruk was alert and oriented, had intact memory, 5/5 strength in all extremities, and her facial sensation and motor function were within normal limits.  Tr. 405.  Mruk had intact coordination, her reflexes were normal and symmetric bilaterally, and her

sensation was intact bilaterally; she also had a normal gait and stance.  Id.  Dr. Gross prescribed Betaseron to treat Mruk's MS since it was less expensive to obtain.  Id.  Mruk had no falls within the previous month, and was not in any increased danger of falling due to her condition.  Tr. 407.

A final MRI of Mruk's brain was conducted on November 2, 2010.  Tr. 492-93.  This MRI revealed no appreciable interval change since the previous MRI on May 11, 2009.  Tr. 492.  The MRI again demonstrated "multiple nonenhancing demyelinating plaques in the cerebellar peduncles on both sides and periventricular white matter of the cerebrum."  Id.

On December 23, 2010, Mruk presented for her final appointment with Dr. Gross.  Tr. 414.  Mruk still had not begun taking Betaseron, and reported numbness and burning in her left shoulder, tripping, and occasional paresthesias in the right side of her face.  Id.  She denied vision issues or weakness in her extremities.  Id.  Dr. Gross noted that Mruk was alert and oriented, her memory was intact, her facial sensation and motor function were within normal limits, and she had 5/5 strength in all extremities.  Tr. 416.  Mruk's coordination was intact, her reflexes were normal and symmetric, and her gait and stance were normal.  Id.  Mruk had no history of falls within the previous month, and her physical and mental impairments did not place her at an increased risk of falling.  Tr. 418.

8

On January 28, 2011, Mruk presented to Dr. Wessel.  Tr. 495.  Dr. Wessel

noted that Mruk had begun taking Betaseron for her MS, and had restarted Celexa

"as she experience[d] more anxiety attacks" since discontinuing medication.  Id.

Mruk denied headaches, blurry vision, numbness or tingling of the extremities,

lightheadedness, or dizziness.  Id.

### B.     Residual Functional Capacity Assessments

On January 18, 2010, Barry Minora, M.D., a state agency physician,

examined Mruk and offered a residual functional capacity assessment.  Tr. 366-69.

Mruk reported multiple MS attacks over the previous years as well as injuries from

various falls within the past two years.  Tr. 366.  She complained of gait imbalance

and dysfunction, but denied headaches or unilateral weakness.  Id.  Dr. Minora

noted that Mruk's sensation was intact bilaterally; she had 5/5 strength throughout,

her range of motion was within normal limits, and her gait and neurological status

were normal.  Tr. 368.  Mruk was alert and oriented, she had no neurological

deficits, and she had a normal affect.  Tr. 368-69.  Dr. Minora opined that Mruk's

"general appearance and ability to interact [were] within normal limits."  Tr. 368.

Mruk had 20/30 vision in her left eye and 20/40 vision in her right eye.  Id.

Dr. Minora opined that Mruk could occasionally lift or carry up to ten

pounds.  Id.  She could only stand and walk for one to two hours in an eight hour

workday due to balance problems, and therefore Dr. Minora believed that she must

be allowed to sit or stand at will throughout the workday.  Id.  Mruk was limited in

her ability to push and/or pull with her extremities, and could only occasionally

bend, kneel, crouch, stoop, balance, climb, or crawl.  Id.  Dr. Minora believed that

Mruk must avoid moving machinery, heights, or vibrations, and should not be

exposed to poor ventilation or temperature extremes.  Id.  Otherwise, Dr. Minora

did not believe Mruk was limited in any way.  Id.

On February 23, 2010, Elizabeth Kamenar, M.D., also a state agency

physician, reviewed Mruk's medical records and completed a residual functional

capacity assessment.  Tr. 374-80.  Dr. Kamenar opined that Mruk was capable of

occasionally lifting and carrying up to twenty pounds and could frequently lift and

carry up to ten pounds.  Tr. 375.  Dr. Kamenar believed that Mruk could stand and

walk for up to six hours in a workday, and could sit for six hours in a workday.  Id.

Mruk could only occasionally balance, stoop, kneel, crouch, crawl, or use stairs or

ramps, and could never climb ladders, ropes, or scaffolds.  Tr. 376.  Dr. Kamenar

opined that Mruk should avoid concentrated exposure to extreme temperatures,

humidity, noise, vibration, airborne irritants, or hazards.  Tr. 377.

## C.    The Administrative Hearing

On March 24, 2011, Mruk's administrative hearing was conducted.  Tr. 35-

70.  At that hearing, Mruk testified that she had worked part time until December

2009; she stated that she was "let go" because "the limitations from my disease

were having me make mistakes at work." Tr. 39-40.  Mruk stated that she had two

children aged six and eleven; an eighteen year old neighbor lived with the family

to help care for the children.  Tr. 41-42.  Mruk testified that her parents, who lived

within a block of her home, would often help with breakfast or preparing supper

for the children.  Tr. 51-53.  Mruk was able to do the dishes, occasionally vacuum,

and fold laundry, although she could not take out the garbage, make the beds, or

perform yard work.  Tr. 54-55.

Mruk testified that her MS had grown increasingly worse over the years; her

symptoms included pain, numbness, cramping, migraines, and dizziness.  Tr. 44.

Her new MS medication, Betaseron, caused side-effects such as abdominal pains,

cramping, and "flu like body aches," but did decrease the severity of her migraines.

Tr. 45.  Her MS caused her to repeatedly drop objects every day.  Tr. 56-57.  Mruk

stated that she would get pain in her chest, headaches, and shakes from her anxiety;

she took Celexa to treat this impairment.  Tr. 47-48.  However, her doctors had

never recommended mental health treatment for anxiety, and Mruk did not believe

she had a mental illness.  Tr. 48.  Mruk stated that, if she needed a mental health

professional, her primary care physician would prescribe one.  Id.

Mruk testified that she was able to lift up to ten pounds, but because of her

MS could not stand, walk, or sit for a long period of time.  Tr. 48-49.  Mruk also

alleged that her vision had deteriorated over the previous two years due to her MS.

Tr. 50.  However, Mruk admitted that she was not prescribed any medication or given any plan of treatment for issues related to her eyes.  Tr. 51.

After Mruk testified, Karen Kane, an impartial vocational expert, was called to give testimony.  Tr. 60.  The ALJ asked Ms. Kane assume a hypothetical individual with Mruk's age, education, and work experience that was limited to sedentary work[2] but required an option to sit or stand at will throughout the workday.  Tr. 66.  Furthermore, the ALJ asked the vocational expert to assume that the hypothetical individual could only occasionally push or pull with her upper extremities; the individual could occasionally climb stairs or ramps, but could never climb ropes, ladders, or scaffolding.  Id.  The individual could occasionally balance, stoop, kneel, crouch, or crawl, but should avoid concentrated exposure to chemicals, moving machinery, hazardous machinery, and unprotected heights.  Id. The hypothetical individual should avoid concentrated exposure to extreme cold or heat, humidity, noise, vibration, poorly ventilated areas, and irritants such as fumes, odors, dust, and gasses.  Id.  Finally, the ALJ limited the individual to simple, routine, and repetitive tasks.  Tr. 67.

---

[2] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

Ms. Kane opined that, given these restrictions, the hypothetical individual would be unable to perform any of Mruk's past relevant work. Id. However, the individual would be capable of performing three other jobs that exist in significant numbers in the regional economy: a video monitor surveillance position, a telephone information clerk, and an order clerk. Id. The ALJ then ask Ms. Kane to assume that Mruk's testimony was entirely credible and supported by medical evidence. Id. Ms. Kane testified that, if Mruk's testimony were entirely accurate, "there would be no work in the workforce" for her. Tr. 68.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and

the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or

14

equals the requirements of a listed impairment, (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy. See 20 C.F.R. § 404.1520.   The

initial burden to prove disability and inability to engage in past relevant work rests

on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a

person with the claimant's abilities, age, education, and work experience can

perform. Mason, 994 F.2d at 1064.

### A.    Development of the Record

Mruk first argues that the ALJ failed to fully develop the record by not

having a medical advisor present at the administrative hearing.  Specifically, Mruk

contends that the ALJ needed medical testimony to determine that Mruk did not

meet or equal a listing at step three of the sequential evaluation process.

"ALJs have a duty to develop a full and fair record in social security cases."

Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).  However, an "ALJs duty to

develop the record does not require a consultative examination unless the claimant

establishes that such an examination is necessary to enable the ALJ to make the

disability determination."  Thompson v. Halter, 45 F.App'x 146, 149 (3d Cir.

2002).  The "decision to order a consultative examination is within the sound

discretion of the ALJ[.]"  Id. (citing Jones v. Bowen, 829 F.3d 524, 526 (5th Cir.

1987).  Furthermore, "an ALJ is not required to obtain an expert opinion as to whether an impairment meets or equals a listing and is fully competent to make an equivalency determination."  Swarrow v. Colvin, No. 2:13-cv-01060, 2014 WL 3420429, at *10 (W.D. Pa. July 14, 2014) (quoting Horne v. Comm'r of Soc. Sec., No. 2:13-cv-00226, 2014 WL 585927, at *6 (W.D. Pa. Feb. 14, 2014)).

The record does not establish that a consultative examination or medical advisor testimony was required for the ALJ to make a disability determination. The ALJ declined to order a neurological examination because Mruk had a treating neurologist.  Tr. 69.  The ALJ stated that if the neurologist's records were not sufficient to enable a decision, she would order a consultative examination.  Id. The ALJ received over one hundred pages of medical records primarily addressing Mruk's neurological disorder, and there has been no showing that these records were inadequate for the ALJ to base her decision upon.  Tr. 401-503.  The ALJ declined to order a psychological examination because she did not believe it was necessary based on Mruk's testimony.  Id.  This decision was supported by Mruk's own testimony that she was not mentally ill, and that her treating physician would prescribe an appointment with a mental health professional if necessary.  Tr. 48.

Additionally, the available medical evidence was sufficient for the ALJ to render a decision at step three of the sequential evaluation process.  The ALJ found

that Mruk's impairments did not meet or equal listing 11.09.[3]  Tr. 23.  In that

regard, Mruk did not meet or equal the requirements of subpart A because there

was no medical evidence suggesting significant and persistent disorganization of

motor function in two extremities.  Mruk did not meet subpart B because her

alleged visual impairment was not severe enough.[4]  Tr. 246, 258, 268, 313-17, 351.

Nor did Mruk meet subpart C; medical records consistently revealed that her motor

function was within normal limits, and her muscle strength was 5/5 in all

extremities at every medical appointment.  Tr. 252, 258, 269, 336, 368, 405, 416.

    The ALJ also determined that Mruk did not meet or equal listing 12.06.  Tr.

23.  The available evidence did not suggest that Mruk's impairments equaled this

listing,[5] particularly in light of the fact that Mruk admitted she was not mentally ill,

---

[3] Listing 11.09 is met if a claimant suffers from MS, accompanied by: "[A] Disorganization of
motor function as described in 11.04B; or [B] visual or mental impairment as described under the
criteria in 2.02, 2.03, or 12.02; or [C] significant, reproducible fatigue of motor function with
substantial muscle weakness on repetitive activity, demonstrated on physical examination,
resulting from neurological dysfunction in areas of the central nervous system known to be
pathologically involved by the multiple sclerosis process."  20 C.F.R. Part 404, Subpart P,
Appendix 1, Section 11.09.

[4] Impairments to the eyes meet or equal a listing when vision in the better of the two eyes after
correction is 20/200 or less. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 2.02.  it may
also be met where there is contraction of the visual field in the better eye, accompanied by (1)
the widest diameter subtending an angle around the point of fixation no greater than 20 degrees;
or (2) An MD of 22 decibels or greater, determined by automated static threshold perimetry that
measures the central 30 degrees of the visual field (see 2.00A6d); OR (3) a visual field efficiency
of 20 percent or less, determined by kinetic perimetry.  Id. at Section 2.03

[5] This listing requires an anxiety-related disorder be accompanied by paragraph B or C criteria.
Paragraph B is met if two of the following criteria are met: (1) marked restriction of activities of
daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in
maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation,
each of extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.06(B).

and stated that her treating physician would refer her to a medical professional if it was needed.  Tr. 48.  Consequently, Mruk has not established that additional medical testimony was required for the ALJ to render her decision at step three, and the ALJ did not err in refusing to order further medical consultations.

### B.     The ALJ's Credibility Determination

Mruk further contends that the ALJ committed reversible error in discounting her statements regarding the intensity, persistence, and limiting effects of her symptoms.  Tr. 25.

If allegations of pain and other subjective symptoms are supported by objective medical evidence, an ALJ must "determine the extent to which a claimant is accurately stating the degree" of the subjective symptoms.  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)).  An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Here, the ALJ found that Mruk's medically determinable impairments could be expected to cause her symptoms, but that Mruk's allegations of intensity, pain, and limiting effects were not fully credible.  Tr. 25.  The ALJ gave several specific examples of medical evidence that directly contradicted Mruk's testimony.  For

---

Paragraph C is met if the claimant's anxiety results in "complete inability to function independently outside the area of one's home." Id. at 12.06(C).

example, the ALJ gave limited weight to Mruk's complaints of falling, tripping, and numbness.  Id.  The ALJ noted that, despite Mruk's complaints, the medical record did not reflect any falls, and Mruk admitted she had not fallen since she was diagnosed with MS.  Id.  The ALJ also noted that Mruk's neurological examinations were "essentially normal;" she had no sensory or motor deficits, had a normal gait, and was never prescribed an assistive device for walking.  Id.

The ALJ also found Mruk's complaints of eyesight problems to be less than credible.  Id.  In that vein, the ALJ noted that Mruk's vision was 20/20 with correction, and her optometrist stated that Mruk's acuity and visual fields were within normal limits.  Id.  The ALJ believed that Mruk's allegations of headaches and nausea were not credible because Mruk frequently denied recent headaches to her physicians and reported that her migraine medication was effective in controlling her headaches.  Id.

Finally, the ALJ believed that Mruk's allegations regarding her anxiety were not credible.  Id.  Though Mruk's primary care provider had prescribed anti-anxiety medication, no physician had ever referred Mruk for any mental health treatment.  Id.  Furthermore, Mruk stated that she did not believe she was mentally ill, and she had twice failed to appear at psychiatric consultations.  Id. Consequently, when viewed in the aggregate, substantial evidence supported the ALJ's credibility determination.  While it is possible that another fact finder may

have decided the issue differently, there is no basis upon which to disturb the

ALJ's determination, particularly in light of the deference that is properly owed to

the ALJ's credibility determinations.

### C.   Residual Functional Capacity Assessment

Finally, Mruk challenges the ALJ's residual functional capacity assessment.

At the administrative hearing, the vocational expert testified that, if all of Mruk's

testimony were accepted as true, she would be incapable of maintaining

substantially gainful employment.  Tr. 68.  Mruk argues that her testimony was

truthful and therefore the ALJ should have found that Mruk was disabled.

Ms. Kane, the vocational expert, did testify that an individual would be

unable to sustain gainful employment if she suffered from the limitations that

Mruk described.  Id.  Thus, if the ALJ had accepted Mruk's subject complaints as

true, she would be required to find that Mruk was disabled.  However, the ALJ

rejected Mruk's alleged symptoms and subjective complaint, and found that his

"statements concerning the intensity, persistence and limiting effects of these

symptoms are not credible . . ."  Tr. 25.  As previously discussed, the ALJ's

credibility conclusion was supported by substantial evidence and, consequently,

the ALJ was not required to find that Mruk was unable to maintain substantially

gainful employment.

Additionally, Mruk's argument is undermined by the fact that no doctor ever opined that Mruk was disabled, and no doctor ever opined that Mruk was more limited than the ALJ found her to be.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be."); Thompson v. Halter, 45 F.App'x 146, 148 (3d Cir. 2002) (citing Hutton v. Apfel, 175 F.3d 651 (8th Cir. 1999); Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983)) ("Most importantly, [no doctor] opined that [the claimant] could not work . . . While the absence of such a statement is not dispositive of the issue of disability, it is surely probative of non-disability.").  Consequently, the ALJ's residual functional capacity determination was supported by substantial evidence.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.